# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DELIA HERNANDEZ, as Personal
Representative of the Estate of
Antonio Medrano, Jr., and
JOANN VILLA, Individually and as
Parent and Next Friend of S.M. and H.M.,

      Plaintiffs,

vs.                                    No. CIV 10-0351 JB/LAM

MANUEL ("MANNY") FRIAS,
ISAIAH BAKER, JOHN AND JANE
DOES I-IV, Individually and in their
Official Capacity as Members of the
Las Cruces Police Department, and
the CITY OF LAS CRUCES,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss for Failure

to State a Claim and in the Alternative, Motion for Summary Judgment, filed June 21, 2010 (Doc.

5)("Motion").  The Court held a hearing on January 3, 2010.  The primary issues are: (i) whether

Defendant Officers Manuel Frias and Isaiah Baker used excessive force when they shot and killed

Antonio Medrano; (ii) whether Defendant City of Las Cruces violated Medrano's infant children's

Fourth Amendment rights or Plaintiff Joann Villa's procedural or substantive due-process rights

when, following Medrano's shooting, it took the children into custody for questioning without

parental consent; (iii) whether the Plaintiffs have established a claim of supervisor liability against

the City of Las Cruces; (iv) whether sovereign immunity bars the Plaintiffs' tort claims under the

New Mexico Tort Claims Act, NMSA 1978, § 41-4-1 through 41-4-27 ("NMTCA"); (v) whether

the Plaintiffs have established a claim under the New Mexico Inspection of Public Records Act,

NMSA 1978, §§ 14-2-1 through 14-2-12 ("NMIPRA"); and (vi) whether the Court should dismiss

the Plaintiffs' punitive damages Count.  The Court grants the Motion in part and denies it in part.

The Court: (i) denies the Defendants' request that it grant summary judgment on the Plaintiffs'

constitutional and NMTCA excessive force claims; (ii) denies the Defendants' request that it grant

summary judgment on the Plaintiffs' constitutional claims on behalf of Villa and her children; (iii)

denies the Defendants' request that it grant summary judgment on the Plaintiffs' NMIPRA claim;

(iv) denies the Defendants' request that it dismiss the Plaintiffs' supervisor liability claim; (v)

dismisses the Plaintiffs' bystander NMTCA claim; and (vi) because punitive damages are not an

independent claim, the Court dismisses the Plaintiffs' punitive damages Count without prejudice to

the Plaintiffs seeking punitive damages under its surviving Counts.

## FACTUAL BACKGROUND

On January 17, 2010, Medrano and Villa agreed to meet in a local park with their children,

S.V. and H.V.  See Affidavit of JoAnn Villa ¶¶ 1 and 2, at 1 (undated, unsigned, and unnotarized),[1]

filed November 24, 2010 (Doc. 16-5); Plaintiffs' Response to Defendants' Motion to Dismiss Or,

in the Alternative, Motion for Summary Judgment ¶ 1, at 3, filed November 24, 2010 (Doc.

---

[1] The Defendants state in their Memorandum in Reply Concerning Defendants' Motion to Dismiss for Failure to State a Claim and in the Alternative, Motion for Summary Judgment, December 9, 2010 (Doc. 17)("Reply"): "[T]he affidavits submitted with Plaintiffs' Response lack signatures, dates, and notarizations and, therefore, should be disregarded. Moreover, even if the affidavits were in proper form, they identify no issue of material fact, which would prevent entry of summary judgment." Reply at 2.  The Court will not assume as true the statements in Plaintiffs' affidavits or any other matters not properly included in the pleadings, but will treat these statements and matters as additional argument and background facts.

16)("Response")(setting forth this fact); Reply at 3 (not controverting this fact).[2]  At the park,

Medrano and Villa argued, and Medrano shoved Villa and took his children to his mother's

residence at 3006 Petunia in Las Cruces, New Mexico.  See Villa Aff. ¶ 3, at 1; Response ¶ 2, at 3

(setting forth this fact); Reply at 3 (not controverting this fact).

---

[2] In their Reply, the Defendants do not controvert the substance of the Plaintiffs' "Statement
of Additional Material Facts Which Preclude Summary Judgment."  Response at 3.  The Court has
recently proposed amendments to D.N.M. LR-Civ 56.1(b) that will require the party responding to
the motion for summary judgment to number any additional facts and the party moving for summary
judgment to specify whether the additional facts are disputed or not in its reply.  A "redline" version
of the proposed revisions to the Local Rules of Civil Procedure of the United States District Court
for the District of New Mexico is currently available on the Court's website at www.nmcourt.fed.us.
The proposed revisions were posted for public comment.  The period for public comment closed
November 24, 2010.  The Court will now consider the comments and further revisions, as necessary.
The proposed version of D.N.M. LR-Civ 56.1(b) states:

> The Memorandum must set out a concise statement of all of the material facts as to
> which the movant contends no genuine issue exists. The facts must be numbered and
> must refer with particularity to those portions of the record upon which the movant
> relies.
>
> The Response must contain a concise statement of the material facts cited by the
> movant as to which the non-movant contends a genuine issue does exist.  Each fact
> in dispute must be numbered, must refer with particularity to those portions of the
> record upon which the non-movant relies, and must state the number of the movant's
> fact that is disputed. All material facts set forth in the Memorandum will be deemed
> undisputed unless specifically controverted.  The Response may set forth additional
> facts other than those which respond to the Memorandum which the non-movant
> contends are material to the resolution of the motion.  Each additional fact must be
> lettered and must refer with particularity to those portions of the record upon which
> the non-movant relies.
>
> The Reply must contain a concise statement of those facts set forth in the Response
> which the movant disputes or to which the movant asserts an objection.  Each fact
> must be lettered, must refer with particularity to those portions of the record upon
> which the movant relies, and must state the letter of the non-movant's fact.  All
> material facts set forth in the Response will be deemed undisputed unless specifically
> controverted.

Proposed revisions to D.N.M. LR-Civ. 56.1(b)(emphasis added).

-3-

A bystander called the police; Villa spoke with the police on the bystander's telephone at the park and then again when she arrived at her home a short time after.  See Villa Aff. ¶¶ 4-5, at 1; Response ¶ 3, at 3 (setting forth this fact); Reply at 3 (not controverting this fact).  Police officers arrived at Villa's residence; Villa related that Medrano had not hit her, but that he had pushed her and held her, and that he had taken their children.  See Villa Aff. ¶¶ 4-5, at 1; Response ¶ 3, at 3 (setting forth this fact); Reply at 3 (not controverting this fact).  When officers were at Villa's residence, Medrano called her residence; the officers would not allow Villa to speak with Medrano to try to calm him down, despite Medrano being obviously distraught.  See Villa Aff. ¶¶ 6-7, at 1; Response ¶ 3, at 3-4 (setting forth this fact); Reply at 3 (not controverting this fact).

Frias and Baker were dispatched to investigate the incident.  See Complaint for Wrongful Death, Violations of the New Mexico Inspection of Public Records Act, and Punitive Damages Arising from Violations of Decedent's Constitutional Rights ¶ 5, at 2, filed April 13, 2010 (Doc. 1)("Complaint"); Memorandum in Support of Defendants' Motion to Dismiss for Failure to State a Claim and in the Alternative, Motion for Summary Judgment ¶ 1, at 3, filed June 21, 2010 (Doc. 6)("Memorandum")(setting forth this fact); Response ¶ 1, at 2 (admitting this fact).  The officers were alerted that Medrano had shoved Villa and might attempt "suicide by cop."  Complaint ¶ 5, at 2.  See Memorandum ¶ 1, at 3 (setting forth this fact); Response ¶ 1, at 2 (admitting this fact). The officers went to the house of Medrano's mother, where Medrano was at that time alone with his two children, ages two and three.  See Complaint ¶ 6, at 2; Memorandum ¶ 2, at 3 (setting forth this fact); Response ¶ 1, at 2 (admitting this fact).  At approximately 4:15 p.m., Hector Nevarez, who lives next door to the Medrano residence, saw a Las Cruces police officer arrive and park in front of one of the houses down the street.  See Second Affidavit of Hector Nevarez ¶¶ 1-2, at 1 (executed

-4-

November 22, 2010)(unnotarized), filed November 24, 2010 (Doc. 16-1); Response ¶ 5, at 4 (setting forth this fact); Reply at 3 (not controverting this fact). Nevarez came out of his house to see what was going on. See First Affidavit of Hector Nevarez ¶ 2, at 1 (executed June 18, 2010), filed June 21, 2010 (Doc. 6-3); Response ¶ 6, at 4 (setting forth this fact); Reply at 3 (not controverting this fact).

Frias and Baker arrived to find Medrano in the front yard holding a kitchen knife; they exited their vehicles with their rifles drawn, and Medrano retrieved a baseball bat from the passenger side of his pickup truck. See Complaint ¶¶ 7, 8, at 2; Affidavit of Willard Chadwick ¶¶ 7, 8, 10, at 2 (executed June 18, 2010), filed June 21, 2010 (Doc. 6-1); Affidavit of Henry Telles ¶¶ 3,6, 8, at 1-2 (executed May 28, 2010), filed June 21, 2010 (Doc. 6-2); First Nevarez Aff. ¶¶ 2, 5, 6, at 1, 2; Second Nevarez Aff. ¶¶ 3-5, at 1; Affidavit of Jeannine Reyes ¶¶ 4, 5, at 1, 2 (executed May 26, 2010), filed June 21, 2010 (Doc. 6-4); Affidavit of Amy Gonzalez ¶ 4, at 1 (executed May 18, 2010), filed June 21, 2010 (Doc. 6-5); Affidavit of Bennie Benavidez ¶ 3, at 1 (executed May 18, 2010), filed June 21, 2010 (Doc. 6-6); Affidavit of Beatrice Benavidez ¶ 3, at 1 (executed June 18, 2010), filed June 21, 2010 (Doc. 6-7); Affidavit of Carol Owensby ¶¶ 3, 4, at 1 (executed June 18, 2010), filed June 21, 2010 (Doc. 6-8); Affidavit of Robert Jones ¶ 5, at 1-2 (undated, unnotarized), filed November 24, 2010 (Doc. 16-3); Complaint ¶ 8, at 2 (setting forth this fact); Memorandum ¶¶ 3, 4, at 3, 4 (setting forth this fact); Response ¶ 1, at 2 (admitting this fact). A third officer, Stephen Montoya, arrived and drew a taser on Medrano. See Jones Aff. ¶¶ 5, 6, at 1-2; Second Nevarez Aff. ¶ 5, at 1 ("The third officer got out with what I thought was a handgun aimed at Mr. Medrano."); Response ¶ 8, at 1 (setting forth this fact); Reply at 3 (not controverting this fact).

The officers repeatedly instructed Medrano to drop his weapons. Specifically, Frias and

Baker repeatedly told Medrano to drop the knife and bat.  See Chadwick Aff. ¶¶ 8, 11, at 2; Telles
Aff. ¶¶ 5, 6, 7, at 2; First Nevarez Aff. ¶¶ 4, 5, and 6, at 1-2; Second Nevarez Aff. ¶¶ 4, 6, at 1;
Reyes Aff. ¶ 4, at 1; Gonzalez Aff. ¶ 4, at 1-2; Ben. Benavidez Aff. ¶ 4, at 1; Bea. Benavidez Aff.
¶ 4, at 1; Affidavit of Martha Lozano ¶ 4, at 1 (executed June 18, 2010), filed June 21, 2010 (Doc.
6-9); Complaint ¶ 10, at 2-3; Memorandum ¶ 5, at 4 (setting forth this fact); Response ¶ 1, at 2
(admitting this fact); id. ¶ 7, at 4 ("The officers repeatedly told Mr. Medrano to get on the ground
and lay down his weapons.").  While witnesses give conflicting accounts of Medrano's behavior,
which are difficult to reconcile, the evidence most favorable to the Plaintiffs is that, instead of
following the officers' orders, Medrano moved toward them, advancing little by little, with weapons
in each hand, telling the officers repeatedly to shoot him.  Compare First Nevarez Aff. ¶¶ 5, 7, at 2
("[Medrano] was advancing little by little toward the officers.  The officers stayed in the street.");
Second Nevarez Aff. ¶ 7, at 1 ("Medrano moved very slowly down his driveway towards the police,
taking a step and pausing with his arms at his side.  He was using obscene language, telling the
officers to 'shoot me.'"); Lozano Aff. ¶ 5, at 2 ("The man in the driveway continued to wave his
arms around and was moving forward and backward, but was continually getting closer to the
officers in the street."); Chadwick Aff. ¶ 11, at 2 ("Mr. Medrano continued to shout profanities at
the officers and walked down the driveway toward them both.  He had his hands raised at chest
height with the weapons pointed up."), with Telles Aff. ¶¶ 5, 6, 7, 8, at 2 ("Medrano began walking
toward both officers.  I would describe his movements as taunting. . . .  He then threw his chest out
and leapt toward the officers"); Ben. Benavidez Aff. ¶¶ 4 and 5, at 1-2 ("Each time the officers told
him to get down, he would lunge forward at them."); Bea. Benavidez ¶ 7, at 2 ("It seemed like the
man was going forward faster, erratically swinging his arms and yelling at the officers and then I

heard the shots when he was almost at the edge of the street."); Owensby Aff. ¶ 6, at 2 ("The man

in the driveway made a lunge toward the officer in the middle.").  Complaint ¶¶ 9, 10, at 2-3;

Memorandum ¶ 6, at 4 (setting forth this fact); Response ¶ 7, at 4 ("Medrano advanced very slowly

down the driveway, taking a step and pausing with his arms at his side. . . .  He kept asking the

officers to shoot him.").[3]  Medrano came within ten to twenty feet of the officers before they opened

---

    [3] The Defendants allege: "Instead of following the officers' orders, the suspect walked
toward them with a weapon in each hand, telling the officers repeatedly to shoot him. . . .  Mr.
Medrano continued to advance on the officers.  He came within ten to twenty feet of them before
they opened fire. He was killed immediately."  Memorandum ¶ 6, at 4.  The Plaintiffs dispute these
facts.  They contend: "Mr. Medrano was not advancing on the officers when he was shot.  At the
time the officers opened fire, he was either standing still or was backing up his driveway.  He was
not threatening the officers with the weapons."  Response ¶ 2, at 2-3.  See Response ¶ 10, at 4 ("As
Mr. Medrano was standing or backing away from the officers . . . .  the officers opened fire[;] Mr.
Medrano was not advancing on them and was not threatening them with the weapons as if to attack
the officers.  Mr. Medrano never rushed the officers.").  The Plaintiffs cite in support of their
allegation Hector Nevarez' second affidavit, Robert Jones' affidavit, the Police Taser Video, and
the Plaintiffs' Statement of Additional Material Facts.
    In Hector Nevarez' second affidavit, he states in relevant part:

        Mr. Medrano moved very slowly down his driveway towards the police, taking a step
        and pausing with his arms at his side.  He was using obscene language, telling the
        officers to "shoot me". . . .  When Mr. Medrano was about 10 feet from the street,
        and the police were about another five feet away, I heard gunfire. . . .  I never saw
        Mr. Medrano raise his weapons as if he was going to attack the officers.  I never saw
        Mr. Medrano rush, run at or move towards the officers as if he was going to attack
        them. All saw was Mr. Medrano taunting the officers, walking very slowly, a step
        at a time.  From where I was, it appeared that the officers had a lot of options to try
        to get Mr. Medrano to obey their commands other than simply shooting him.

Second Nevarez Aff. ¶¶ 7-8, 10-11, at 1.  In his first affidavit, he states:

        The man was shouting obscenities at the officers and saying "I shoot me
        motherfuckers" like he was provoking the officers.  He was advancing little by little
        toward the officers.  The officers stayed in the street. . . .  I saw then that the guy had
        two objects in his hands and he was holding them out to the side.  The officers kept
        telling the man to get down. . . .  The guy then got closer to the officers and I heard
        three shots.

First Nevarez Aff. ¶¶ 5-7, at 2.

Robert Jones, Plaintiffs' expert and a decorated veteran of the Dona Ana County Sheriff's Department, states in his affidavit that, based on his review of witness interviews, incident reports, personnel files of Baker and of Frias, Medrano's autopsy report, and the Las Cruces Police Department's SOP manual which was in effect at the time of this shooting, see Jones Aff. ¶ 2, at 1, that "Officer Montoya said that Antonio was jumping towards them and then hopping back and forth. . . .  It is apparent from the statement of Officer Montoya that Antonio did not charge the officers, he simply hopped back and forth."  Jones Aff. ¶ 6, at 2.  Jones also describes other witnesses' statements:

> [Nevarez] saw Mr. Medrano holding a knife and a bat.  Mr. Nevarez describes Mr. Medrano "taunting" the officers, but not threatening or rushing them.  Mr. Nevarez goes on to say that Mr. Medrano never raised his weapons as if he was threatening to attack the officers.  Mr. Nevarez stated that Mr. Medrano was yelling at the officers to shoot him.  The officers were telling Mr. Medrano to lay down his weapons and get on the ground.  Nevarez said that all of the sudden the officers started to fire their weapons at Mr. Medrano and that Mr. Medrano fell to the ground. . . .  Mr. Nevarez stated that at no time did he see Mr. Medrano lunge or run at the officers.  This is consistent with the statement of at least one other witness, Krisantha Gutierrez, who said that Mr. Medrano was "just standing there" in his driveway and the officers shot him.  Mr. Nevarez said he was shocked that they shot Mr. Medrano for no reason.  These descriptions of the incident are consistent with the taser video.

Jones' Aff. ¶¶ 7-9, at 2.  Jones' relaying other non-party witnesses' statements is hearsay, and it is unclear if he is merely interpreting Nevarez' affidavit.  Jones' statements are therefore not properly before the Court for the truth of the matter asserted -- the other witness statements.

The Police Taser Video shows Romero slowly stepping backwards in his driveway.  The video is unenlightening on Medrano's actions at the moment he was shot, however, because it was not taken at the time of the shooting, but some moments before.  The video was taken while Montoya trained his taser on Medrano.  It is undisputed that the brief video was taken while Montoya trained his taser on Medrano when he first arrived, but Montoya switched to his rifle before the officers shot Romero.  See Jones Aff. ¶ 6, at 2 ("In viewing  the taser video, one of the officers tells Officer Montoya to put the taser away.  Officer Montoya did so and transitioned to his AR 15.").  Consequently, the video does not reveal Medrano's actions when he was shot.

None of the admissible evidence the Plaintiffs put forward controverts that Romero was moving toward the officers when they shot him.  Nevarez' statements that Romero moved "very slowly down his driveway," "advancing little by little toward" the officers, however, controverts the Defendants' allegation that Romero "walked" toward the officers.  The Court the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

fire, killing him.  <u>See</u> Chadwick Aff. ¶¶ 10, 12, at 2 (stating that Medrano was at the "end of the driveway" and the officers were in the "middle of the street"); Second Nevarez Aff. ¶ 8, at 1 ("When Mr. Medrano was about 10 feet from the street, and the police were about another five feet away, I heard gunfire"); Ben. Benavidez Aff. ¶ 5, at 2 ("The officers were in the roadway and the man was in the drive."); Lozano Aff. ¶ 5, at 2 ("The man in the driveway continued to wave his arms around and was moving forward and backward, but was continually getting closer to the officers in the street."); Complaint ¶ 10, at 3 ("Medrano came within 10-20 feet of the officers"); Memorandum ¶ 7, at 4 ("He came within ten to twenty feet of them before they opened fire."); Response ¶ 2, at 2-3 (not controverting this fact).[4]

---

(1986)("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  The Court concludes, therefore, that Medrano was moving very slowly toward the officers, advancing little by little.

   [4] Local rule 56.1 provides:

**Statement of Material Facts.** The moving party must file with the motion a written memorandum containing a short, concise statement of the reasons in support of the motion with a list of authorities relied upon.  A party opposing the motion must file a written memorandum containing a short, concise statement of the reasons in opposition to the motion with authorities.  The moving party may file a written reply memorandum.

   The memorandum in support of the motion must initially set out a concise statement of all of the material facts as to which movant contends no genuine issue exists.  The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies.

   A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist.  <u>Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.</u>

Nevarez and Jones assert that the officers had non-lethal options to get Medrano to comply with their commands.  See Jone Aff. ¶ 10, at 2-3; Nevarez Aff. ¶ 11, at 1 ("From where I was, it appeared that the officers had a lot of options to try to get Mr. Medrano to obey their commands other than simply shooting him"); Response ¶ 11, at 5 (setting forth this fact); Reply at 3 (not controverting this fact).  The Las Cruces Police Department's standard operating procedures in effect at the time Medrano was shot required that the officers responding to the scene were required to use the services of a trained crisis intervention officer.  See Jones Aff. ¶ 4, at 1; Response ¶ 12, at 5 (setting forth this fact); Reply at 3 (not controverting this fact).  Jones notes that the only belt dictation provided from any of the three officers at the scene does not record any sounds until immediately after Medrano was shot.  In Jones' opinion, it is "highly suspicious" that an officer who has just witnessed and/or participated in a fatal shooting would immediately act by turning on his

---

D.N.M.LR-Civ. 56.1 (emphasis added).  "[L]ocal rules of practice, as adopted by the district court, 'have the force and effect of law, and are binding upon the parties and the court which promulgated them . . . .'"  Smith v. Ford Motor Co., 626 F.2d 784, 796 (10th Cir. 1980)(quoting Wood Constr. Co. v. Atlas Chem. Indus., Inc., 337 F.2d 888, 890 (10th Cir. 1964), cert. denied, 450 U.S. 918 (1981)).  See Bylin v. Billings, 568 F.3d 1224, 1230 n.7 (10th Cir. 2009)("Although a district court's local rules of practice are technically binding on both the court and the parties, '[c]onsiderable deference is accorded to the [court's] interpretation and application of [its] own rules of practice and procedure.'" (quoting Smith v. Ford Motor Co., 626 F.2d at 796)(alterations in original)).  In ruling on the purpose of a predecessor rule to D.N.M.LR-Civ. 56.1(b), the United States Court of Appeals for the Tenth Circuit observed:

> Consistent with Fed. R. Civ. P. 56, Local Rule 56.1(b) facilitates the district court's review of summary judgment motions by requiring nonmovants to specifically identify and properly support what nonmovants claim are material disputed facts and point out the movants' alleged facts that they dispute; otherwise, the movants' facts will be deemed admitted.

Smith v. E.N.M. Med. Ctr., 72 F.3d 138, at *4 (10th Cir. 1995).  Because the Plaintiffs do not controvert the Defendants' fact, the Court deems it admitted.

-10-

dictation unit.  Jones Aff. ¶ 11, at 3.  Villa heard gunshots from down the street about three minutes after Medrano tried to call her.  See Villa Aff. ¶ 8, at 1.

Medrano's children witnessed his death.  See Complaint ¶ 11, at 3; Memorandum ¶ 8, at 4 (setting forth this fact); Response ¶ 3, at 3 (admitting this fact).  Immediately after Medrano was shot, the Defendants refused to allow Villa to go to and comfort her children; instead, they told her to have someone else come and "pick up the children."  Villa Aff. ¶¶ 8, 9, at 1.  See Response ¶ 16, at 6 (setting forth this fact); Reply at 3 (not controverting this fact).  The children's Uncle picked them up and was directed to take them to the police station, where the children were taken into police custody without Villa's consent, and one of them was questioned regarding the incident without Villa present.  See Complaint ¶ 11, at 3; Memorandum ¶ 9, at 4 (setting forth this fact); Response ¶ 3, at 3 (admitting this fact); id. ¶ 17, at 6 ("Defendants then ordered Ms. Villa's brother to take the infants to the Las Cruces police station for interrogation.  This was done without Ms. Villa's knowledge or permission.").  By the time Villa was reunited with her children, they were terrified; since that time, the children have required counseling and, in the opinion of their mother, remain deeply terrified to this day of law-enforcement officers.  See Villa Aff. ¶¶ 9, 10, 11, at 1-2; Response ¶ 17, at 6 (setting forth this fact); Reply at 3 (not controverting this fact).

On January 22, 2010, the Plaintiffs' counsel sent a tort claim notice to City of Las Cruces. In this letter, the City of Las Cruces was notified that it should preserve all relevant evidence and documentation regarding the events leading to Medrano's death.  See Letter from James Lyle to Terrence Moore and Peter Bradley (dated January 22, 2010), filed June 21, 2010 (Doc. 6-10, at 9, Ex. 3); Affidavit of James P. Lyle ¶ 3, at 1 (undated, unnotarized), filed November 24, 2010 (Doc. 16-4); Response ¶ 18, at 6 (setting forth this fact); Reply at 3 (not controverting this fact).  On

January 29, 2010, the City of Las Cruces responded to the tort claims notice with a letter.  The response indicated the City of Las Cruces considered the Plaintiffs' January 22, 2010 letter as a request for inspection of documents.  The letter went on to say that the records and information would not be produced, because there was a possibility of criminal prosecution against the individual Defendants.  See Letter from Harry Connelly to James Lyle (dated January 22, 2010), filed June 21, 2010 (Doc. 6-10, at 11, Ex. 4); Lyle Aff. ¶ 3, at 1; Affidavit of Esther Martinez ¶ 8, at 2 (executed June 17, 2010), filed June 21, 2010 (Doc. 6-10); Response ¶ 18, at 6 (setting forth this fact).

On February 2, 2010, the Plaintiffs sent their first formal Public Records Request to the City of Las Cruces City Attorney's Office.  See Letter from James Lyle to Harry Connelly (dated February 2, 2010), filed June 21, 2010 (Doc. 6-10, at 5, Ex. 1); Lyle Aff. ¶ 3, at 1; Martinez Aff. ¶ 6, at 2; Memorandum ¶ 10, at 4-5 (setting forth this fact); Response ¶ 19, at 6-7 (setting forth this fact).  On this same day, the City of Las Cruces advised that this request had been forwarded to its records custodian.  See Letter from Harry Connelly to James Lyle (dated February 2, 2010), filed June 21, 2010 (Doc. 6-10, at 7, Ex. 2); Lyle Aff. ¶ 3, at 1; Martinez Aff. ¶ 6, at 2; Memorandum ¶ 10, at 4-5 (setting forth this fact); Response ¶ 19, at 6-7 (setting forth this fact).  Accordingly, the City Clerk's Office received a request for inspection of public records related to Medrano from the City Attorney's Office for the City of Las Cruces.  See Martinez Aff. ¶ 6, at 2, Memorandum ¶ 10, at 4-5 (setting forth this fact); Response ¶ 3, at 3 (admitting this fact).

Pursuant to the report, the City Clerk's Office requested that the City Police and Legal Department provide it with information relative to the request.  The City Legal Department provided the City Clerk with a copy of James P. Lyle's January 22, 2010 letter to the City Manager and Police

Chief, as well as the City Attorney's response to that initial January 22, 2010, letter.  See Martinez

Aff. ¶¶ 7, 8, at 2; Memorandum ¶ 11, at 5 (setting forth this fact); Response ¶ 3, at 3 (admitting this

fact).  On February 4, 2010, the City Clerk's Office denied Mr. Lyle's request under the Inspection

of Public Records Act, stating: "The records requested are confidential law enforcement records

protected under Section 14-2-1(A)(4) of the Inspection of Public Records Act. Once any criminal

investigation or prosecution by any enforcement or prosecuting attorney is concluded all records not

exempt from release will be released."  Letter from to James Lyle from Ether Martinez (dated

February 4, 2010), filed June 21, 2010, at 1-2 (Doc. 6-10, at 14-15, Ex. 5).  See Martinez Aff. ¶ 9,

at 2; Lyle ¶ 5, at 2; Memorandum ¶ 12, at 5 (setting forth this fact); Response ¶ 3, at 3 (admitting

this fact).

In early March, 2010, the Dona Ana County District Attorney announced that no criminal

charges would be brought against the individual Defendants.  See Lyle Aff. ¶ 4, at 2; Response ¶ 19,

at 7 (setting forth this fact); Reply at 3 (not controverting this fact).  On March 19, 2010, the

Plaintiffs sent another documents request directly to the City Manager and Chief of Police.  See

Letter from James Lyle to Terrence Moore and Peter Bradley (dated March 19, 2010), filed June 21,

2010 (Doc. 6-10, at 16, Ex. 6); Lyle's Aff. ¶ 3, at 1-2; Martinez Aff. ¶ 10, at 2 ("This request had

again been sent directly to the City Manager and Chief of Police"); Memorandum ¶ 13, at 5 ("The

March 30, 2010, request had again been sent directly to the City Manager and Chief of Police.");

Response ¶ 3, at 3 (admitting this fact); id. ¶ 20, at 7 ("On March 19, 2010, Plaintiffs sent a second

request to the City for the public records and materials in question").  On March 30, 2010, the City

Attorney's Office forwarded the second request for records related to Medrano to the City Clerk's

Office.  See Martinez Aff. ¶ 10, at 2; Memorandum ¶ 13, at 5 (setting forth this fact); Response ¶

3, at 3 (admitting this fact).  On April 5, 2010, the Clerk for the City of Las Cruces again denied the release of the records, once more stating: "The records requested are confidential law enforcement records protected under Section 14-2-1(A)(4) of the Inspection of Public Records Act. Once any criminal investigation or prosecution by any enforcement or prosecuting attorney is concluded all records not exempt from release will be released."   Letter from Esther Martinez to James Lyle (dated April 5, 2010), filed June 21, 2010 (Doc. 6-10, at 18, Ex. 7).  See Martinez Aff. ¶ 11, at 2; Memorandum ¶ 14, (setting forth this fact).  The Plaintiffs' counsel, however, never received the April 5, 2010 letter.  See Lyle's Aff. ¶ 3, at 1-2; Response ¶ 20, at 7 (setting forth this fact); Reply at 3 (not controverting this fact).  Unlike the previous denials, this letter was not sent by facsimile transmission.  Mr. Lyle states that it is doubtful that the April 5, 2010 letter was ever sent. See Lyle's Aff. ¶ 5, at 2.  On August 9, 2010, after the Plaintiffs filed and served this lawsuit, the City of Las Cruces voluntarily provided the materials that had been the subject of the Plaintiffs' requests.  See Lyle Aff. ¶ 6, at 2; Response ¶ 20, at 7 (setting forth this fact).

## PROCEDURAL BACKGROUND

The Plaintiffs have brought suit for various violations of both the United States Constitution and the laws of New Mexico, alleging that the officers had an affirmative duty to use less than lethal force when confronted with a potentially lethal situation, and that the Defendants mishandled Medrano's children after the shooting and failed to provide records of the event to the Plaintiffs. In Count I of the Complaint, the Plaintiffs bring claims on behalf of Medrano's Estate against the individual Defendants.  The Plaintiffs assert that the use of deadly force was not objectively reasonable, and was a violation of Medrano's Fourth, Fifth, and Fourteenth Amendment rights. They allege that the police officers should have retreated.  The Plaintiffs' Complaint further argues

that the officers could have used less-than-lethal force.

In Count II, the Plaintiffs bring claims against the Individual Defendants on behalf of the Estate for gross negligence and bystander liability claims.  The Plaintiffs contend that the Frias and Baker's use of deadly force against Medrano was grossly negligent.  They also contend that the Individual Defendants are liable to Medrano children under a bystander negligence theory, because the children witnessed his shooting and were then taken to the police station and interviewed without Villa or her consent.

In Count III, the Plaintiffs bring claims against the Individual Defendants for the violation of Villa's minor children's Fourth, Fifth, and Fourteenth Amendment rights, alleging that the temporary custody of her minor children was an unlawful seizure.  The Plaintiffs further contend that the Defendants violated Villa's substantive and procedural due-process rights to familial association and familial integrity under the Fourth, Fifth and Fourteenth Amendments when they refused to permit her to go see her children after they witnessed their father's shooting.

In Count IV, the Plaintiffs bring supervisory liability claims against the City of Las Cruces, alleging that "[t]he constitutional deprivations committed by the individual Defendants were the result of the policies, practices and procedures of the Las Cruces Police Department."  Complaint ¶ 31, at 6.  In Count V, the Plaintiffs seek punitive damages for their constitutional claims against the Individual Defendants.  In Count VI, the Plaintiffs bring a claim against the City of Las Cruces for a violation of the Inspection of Public Records Act, alleging that the City of Las Cruces failed to permit the Plaintiffs to access to the public records and information prepared and collected in connection with Medrano's shooting.  The Plaintiffs seek compensatory and punitive damages, fees and costs, and copies of all documents and investigative materials required under the Inspection of

Public Records Act.

The Defendants move the Court to dismiss or grant summary judgment against all of the Plaintiffs' claims. Because of the nature of the relief requested in their motion, the Defendants did not seek concurrence of opposing counsel before filing the motion. Pursuant to D.N.M.LR-Civ. 56, the Defendants file contemporaneously with their motion a memorandum in support. Specifically, the Defendants move to dismiss the Complaint for failure to state a claim in accordance with rule 12(b)(6) of the Federal Rules of Civil Procedure. The Defendants contend that they are entitled to qualified immunity and that the Plaintiffs have not stated a claim which would overcome this defense. Additionally, pursuant to rule 56 of the Federal Rules of Civil Procedure, the Defendants alternatively move for summary judgment as to each claim.

For the purpose of this motion only, the Defendants do not dispute any allegation in the Complaint. The Defendants contend that these allegations, viewed in the light most favorable to the Plaintiffs, are not sufficient to state a claim for which relief can be granted. Alternatively, the Defendants request that the Court grant summary judgment as to each claim, because there are no genuine issues of material fact in dispute, and the Defendants are entitled to judgment as a matter of law. The Defendants contend that the officer's use of deadly force was objectively reasonable given the threat of immediate physical harm to officers Frias, Baker, and others. The Defendants also contend that it was reasonable to take Medrano's children into custody after the shooting, and that doing so was not a violation of a clearly established constitutional right. The Defendants contend that the Plaintiffs offer no evidence to support holding the City of Las Cruces liable for any constitutional violations. The Defendants further contend that they are immune from the Plaintiffs' tort claims under the NMTCA. Finally, the Defendants assert that the Court should dismiss

-16-

Plaintiffs' NMIPRA claims, because the Defendants responded to the Plaintiffs' records requests and provided all the records the Plaintiffs sought.

The Plaintiffs respond that there is a genuine question of material fact whether the officers' use of force was objectively reasonable. The also contend that taking the children into custody violated the children's and Villa's Fourth Amendment and substantive due-process rights. They contend that the NMTCA has waived immunity for excessive forces claims based on gross negligence. They also contend that the Defendants' delay in responding to their document requests is actionable.

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations

must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (internal citation omitted).  "[T]he Supreme Court recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  "The [Supreme] Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss."  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(alterations omitted).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177.  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotes omitted).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to

be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING EXCESSIVE FORCE

The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard.  See Graham v. Connor, 490 U.S. 386, 395 (1989)("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard . . . .").  The Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."  Saucier v. Katz, 533 U.S. 194, 205 (2001).  When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)."  Cortez v.

McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

>    **1.     Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.  In Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008), the Tenth Circuit stated:

>    In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors. These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect. See, e.g., Walker v. City of Orem, 451 F.3d 1139, 1159 (10th Cir.2006); Jiron, 392 F.3d at 414-15; Zuchel v. Spinharney, 890 F.2d 273, 274 (10th Cir.1989).

511 F.3d at 1260.  In Weigel v. Broad, 544 F.3d 1143 (10th Cir.2008), the Tenth Circuit also provided:

>    Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  The court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case." Estate of Larsen v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).

>    **2.     Least- or Less-forceful Alternatives in Excessive-Force Cases.**

To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor.  The Fourth Amendment requires only

-22-

that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed to the officers in a force situation, regardless of the availability of less intrusive alternatives.  Graham v. Connor, 490 U.S. at 397.

In Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints, and stated that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.  Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means.").  To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable.

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the Terry[5] stop of a suspected drug courier in an airport.  The Supreme Court rejected Sokolow's contention that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics."  490 U.S. at 11.  Instead, the Supreme Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to make

---

[5] Terry v. Ohio, 392 U.S. 1 (1968).

swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing." Id. at 11 (internal quotations and citations omitted). Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit disagreed with the plaintiff's contention that expert testimony about when a police dog's use is objectively reasonable and about how defendant Lehocky's actions violated "well established law enforcement standards . . . should have been admitted since it would have been helpful to the jury in determining whether Lehocky's used a reasonable amount of force." 399 F.3d at 1222. In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones." United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994). Similarly, "violations of state law and police procedure generally do not give rise to a 1983 claim" for excessive force. Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995) (holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force). Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." Olsen [v. Layton Hills Mall], 312 F.3d [1304,] 1314 [ (10th Cir.2002) ]. Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions." [United States v.] Melendez-Garcia, 28 F.3d at 1052

> Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez. In

making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related. This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of County Comm'rs, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones." Id. at 1052 (internal quotations omitted). See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means.")(quotation and citation omitted); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Tennessee v. Garner [471 U.S. 1 (1985) ] and Graham v. Connor."), cert. denied, 513 U.S. 820 (1994); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . . Officers thus need not avail themselves of the least intrusive

-25-

means of responding to an exigent situations; they need only act within that range of conduct we identify as reasonable."), cert. denied, 515 U.S. 1159 (1995); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually did was reasonable.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative."  Jonas v. Board of Comm'rs of Luna County, 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.).  See, e.g., Blossom v. Yarbrough, 429 F.3d 963, 968 (10th Cir. 2005)(quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable).  See also Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F. Supp. at 1100.  Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means."  Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983). The Court has also rejected the consideration of a less intrusive alternative to end a threat.  See Chamberlin v. City of Albuquerque, No. CIV 02-0603 JB/ACT, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

**LAW REGARDING SEIZURES UNDER THE FOURTH AMENDMENT**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society." Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961). "[W]hether a particular seizure is reasonable is dependent on the 'totality of the circumstances.'" Ryder v. City of Topeka, 814 F.2d 1412, 1419 n.16 (10th Cir. 1987).

1.     **Investigative Detentions**.

Investigative detentions are "Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion [that the person stopped is involved in] criminal activity." United States v. Davis, 94 F.2d 1465, 1468 (10th Cir. 1996). The Tenth Circuit, in determining the reasonableness of an investigative detention, applies a two-prong test: (i) "whether the officer's action was justified at its inception"; and (ii) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996)(quoting Terry v. Ohio, 392 U.S. 1 (1968)).

Law-enforcement officers may temporarily detain a person for questioning or investigation where they have a reasonable and articulable suspicion that criminal activity may be afoot. See Terry v. Ohio, 392 U.S. 1, 27 (1968). There are no hard and fast rules regarding the reasonableness of the time and manner of an investigatory stop. The permissible scope of a stop cannot be

determined by reference to bright-line rules.  Rather, common sense and ordinary experience must

be the police officer's guide.  See United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002).

Additionally, courts should not second-guess a police officer's on-the-spot decisions.  See id.

> ### 2.  **Bystander Claims.**

Section 1983 provides a cause of action only for violations of a plaintiff's personal rights and

not for the rights of someone else.  See Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990).

Historically, the guarantee of due process has been applied to deliberate decisions of government

officials to deprive a person of life, liberty, or property.  See Archuleta v. McShan, 897 F.2d at 497

(quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).  Moreover, the element of deliberateness

requires directing of the misconduct toward the plaintiff before the Due Process Clause is

implicated.  See Archuleta v. McShan, 897 F.2d at 499.  In Archuleta v. McShan, the Tenth Circuit

used the term "bystander" to refer to someone who witnessed a police action, but who is not himself

or herself part of the action.  As such, a bystander is unable to assert the kind of deliberate

deprivation of his or her rights necessary to state a due-process claim under § 1983.  See also

Grandstaff v. City of Borger, 767 F.2d 161, 172 (5th Cir. 1985)(holding that a rancher's wife and

stepsons who witnessed a mistaken shooting of the rancher by police had no constitutional claim for

their own emotional injuries under § 1983, because there is no constitutional right to be free from

witnessing this police action); Coon v. Ledbetter, 780 F.2d 1158, 1160-61 (5th Cir. 1986)(holding

that the wife who witnessed sheriff's deputies shooting into her mobile home had no constitutional

claim for emotional injuries because the deputies' action was not directed towards her).

### LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA because it recognized "the inherent unfair

and inequitable results which occur in the strict application of the doctrine of sovereign immunity."

NMSA 1978, § 41-4-2A.  The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen
> ambit of his activity, the area within which the government has the power to act for
> the public good is almost without limit, and therefore government should not have
> the duty to do everything that might be done.

NMSA 1978, § 41-4-2A.  As a result, it was "declared to be the public policy of New Mexico that

governmental entities and public employees shall only be liable within the limitations of the Tort

Claims Act and in accordance with the principles established in that act."  NMSA 1978, § 41-4-2A.

The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent

person's standard of care in the performance of that duty."  NMSA 1978, § 41-4-2C.

> The NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort for
> which immunity has been waived under the Tort Claims Act and no other claim, civil
> action or proceeding for damages, by reason of the same occurrence, may be brought
> against a governmental entity or against the public employee or his estate whose act
> or omission gave rise to the suit or claim.

NMSA 1978, § 41-4-17A.  A plaintiff may not sue a governmental entity of New Mexico, or its

employees or agents, unless the plaintiff's cause of action fits within one of the exceptions granted

for governmental entities and public employees in the NMTCA.  See Begay v. State, 104 N.M. 483,

486, 723 P.2d 252, 255 (Ct. App. 1985)("Consent to be sued may not be implied, but must come

within one of the exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by

Smialek v. Begay, 104 N.M. 375, 721 P.2d 1306 (1986).   A plaintiff also may not sue a

governmental entity or its employees for a damage claim arising out of violations of rights under the

New Mexico Constitution unless the NMTCA contains a waiver of immunity.  See Barreras v. N.M.

Corr. Dep't, 133 N.M. 313, 319, 62 P.3d 770, 776 (Ct. App. 2003)("In the absence of affirmative

legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act."); Chavez v. City of Albuquerque, 124 N.M. 479, 482, 952 P.2d 474, 477 (Ct. App. 1998)(noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity); Rubio v. Carlsbad Mun. Sch. Dist., 106 N.M. 446, 449, 744 P.2d 919, 922 (Ct. App. 1987)(holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); Begay v. State, 104 N.M. at 488, 723 P.2d at 257 (finding that no waiver existed in NMTCA for suit under Article II, § 11 of the New Mexico Constitution).   Thus, if no specific waiver can be found in the NMTCA, the courts must dismiss a plaintiff's complaint against the governmental entity or its employees.   See Begay v. State, 104 N.M. at 486, 723 P.2d at 255.

Section 41-4-12 of the NMTCA provides a waiver of immunity for certain torts law-enforcement officers commit and for negligence that causes a specified tort. See Oliveros v. Mitchell, 449 F.3d 1091, 1096 (10th Cir. 2006)(citing Methola v. County of Eddy, 95 N.M. 329, 333, 622 P.2d 234, 238 (1980); Caillouette v. Hercules, Inc., 113 N.M. 492, 497, 827 P.2d 1306, 1311 (Ct. App. 1992)).   Section 41-4-12 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12.

> [I]n order to state a tort claim under the waiver of immunity set out in Section 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law.

Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 121 N.M. 646, 649, 916 P.2d 1313, 1316 (1996).

A law-enforcement officer is a "full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor." NMSA 1978, § 41-4-3. "New Mexico courts have construed this definition strictly." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-633, 2009, U.S. Dist. LEXIS 47154, at *10 (D.N.M. Apr. 20, 2009)(citing cases). See, e.g., Montes v. Gallegos, 812 F. Supp 1165, 1172 (D.N.M. 1992)(holding that mayor is not a law-enforcement officer under the NMTCA, notwithstanding his statutory authority and obligation to exercise law-enforcement functions); Dunn v. McFeeley, 127 N.M. 513, 984 P.2d 760, 767 (Ct. App.)(holding a medical investigator and crime laboratory technician are not law-enforcement officers under the NMTCA), cert. denied, 127 N.M. 389, 981 P.2d 1207 (1999); Coyazo v. State, 120 N.M. 47, 51, 897 P.2d 234, 238 (Ct. App. 1995)(holding that the district attorney and his staff are not law-enforcement officers under § 41-4-3D); Callaway v. N.M. Dep't of Corr., 117 N.M. at 641, 875 P.2d at 397 (holding that correctional officers at penitentiary are not law-enforcement officers under the NMTCA, notwithstanding their statutory power to make arrests); Dunn v. State ex rel. Tax. and Rev. Dep't, 116 N.M. 1, 4, 859 P.2d 469, 472 (Ct. App. 1993)(holding that Director of Motor Vehicle Division is not a law-enforcement officer under the NMTCA, notwithstanding his statutory power to make

arrests); <u>Vigil v. Martinez</u>, 113 N.M. 714, 721, 832 P.2d 405, 412 (Ct. App. 1992)(holding that

probation and parole officers are not law-enforcement officers under the NMTCA); <u>Anchondo v.</u>

<u>Corr. Dep't</u>, 100 N.M. 108, 111, 666 P.2d 1255, 1258 (1983)(holding that the Secretary of

Corrections and the warden of a state penitentiary are not law-enforcement officer under the

NMTCA).  <u>See</u> <u>also</u> <u>Johnson v. Holmes</u>, 377 F. Supp. 2d 1069, 1083 (D.N.M. 2004)(Browning, J.)

("'Akin' to a law enforcement officer is, as a matter of law, insufficient to waive sovereign

immunity under § 41-4-12 NMSA 1978."), <u>aff'd</u>, 455 F.3d 1133 (10th Cir. 2006).  "To determine

whether positions are of a law enforcement nature, this Court will look at the character of the

principal duties involved, those duties to which employees devote the majority of their time."

<u>Anchondo v. Corr. Dep't</u>, 100 N.M. at 110, 666 P.2d at 1257.

The NMTCA does not waive sovereign immunity for simple negligence of law-enforcement

officers. <u>See</u> <u>Caillouette v. Hercules, Inc.</u>, 113 N.M. 492, 497, 827 P.2d 1306, 1311 (Ct. App. 1992).

The Supreme Court of New Mexico has stated that "no case has held that simple negligence in the

performance of a law enforcement officer's duty amounts to commission of one of the torts listed

in [§ 41-4-12]." <u>Bober v. N.M. State Fair</u>, 111 N.M. 644, 653-54, 808 P.2d 614, 623-24 (1991). The

Court of Appeals for New Mexico has construed the NMTCA as "evincing a legislative intent not

to waive immunity for injuries to indirect or incidental victims of tortious acts committed by

government employees." <u>Lucero v. Salazar</u>, 117 N.M. 803, 806, 877 P.2d 1106, 1109 (Ct. App.

1994).  The Supreme Court of New Mexico has held that the Legislature has not waived immunity

for claims of intentional infliction of emotional distress, <u>see</u> <u>Garcia-Montoya v. State Treasurer's</u>

<u>Office</u>, 130 N.M. 25, 16 P.3d 1084 (2001)(upholding dismissal of intentional infliction of emotional

distress claim, because immunity is not waived under NMTCA), and negligent infliction of

emotional distress, see Weinstein v. City of Santa Fe, 121 N.M. at 653, 916 P.2d at 1320 (holding that a plaintiff may not maintain a separate bystander claim for negligent infliction of emotional distress under § 41-4-12).

## ANALYSIS

The central issue in this case is whether the officers used excessive force against Medrano when they shot him. There is evidence that Medrano was twenty feet from the officers at the time of the shooting, and that he moved slowly towards them, armed with a bat and a knife. The Court concludes that a genuine question of material fact exists whether the officers' actions were objectively reasonable.

## I.   THE PLAINTIFFS HAVE STATED A CLAIM UPON WHICH RELIEF CAN BE GRANTED WITH RESPECT TO THEIR FEDERAL EXCESSIVE FORCE CLAIM.

The Plaintiffs allege that the shooting of Medrano constituted excessive force. The Defendants contend that the officers' response to Medrano was objectively reasonable. The Court concludes that it cannot say, as a matter of law, that the officers actions were objectively reasonable.

The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the reasonableness standard of the Fourth Amendment. See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard . . . ."). The Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397. Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that

on-scene perspective." Saucier v. Katz, 533 U.S. at 205.

In assessing the degree of threat that the officers faced, the Court may consider a number of non-exclusive factors, including: (i) whether Frias and Baker ordered Medrano to drop his weapons, and Medrano's compliance with police commands; (ii) whether Medrano made hostile motions with the weapons towards Frias and Baker; (iii) the distance separating Frias and Baker from Medrano; and (iv) Medrano's manifest intentions. See Estate of Larsen v. Murr, 511 F.3d at 1260. Graham v. Connor also set forth a list of factors relevant to the merits of the constitutional excessive force claim, "requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. at 396. In analyzing the reasonableness of "deadly force," the Court must also take into account not only the number of lives at risk, but Frias' and Baker's relative culpability. See Scott v. Harris, 550 U.S. 372, 384 (2007).

The Defendants contend that the Plaintiffs have pled a case against the individual officers in which the Plaintiffs cannot overcome qualified immunity. There is certainly evidence that the use of deadly force was objectively reasonable. Frias and Baker witnessed Medrano, who was already armed with a foot-long kitchen knife, retrieve a baseball bat from his vehicle. They ordered him to drop his weapons. He did not do so. Instead, Medrano moved toward the officers waving his bat and knife, shouting profanities. He repeatedly told them to shoot. The officers stood their ground with guns drawn and aimed while Medrano continued to close distance until he got to within ten to twenty feet of them. There is evidence that Medrano's intentions were clear: he would continue his assault until he forced a defense.

-34-

There is also evidence, however, that the use of deadly force was not objectively reasonable, because Medrano did not present a threat of immediate physical harm to Frias, Baker, or to others. The Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  The officers were responding to an unwitnessed petty misdemeanor assault against a household member. See NMSA 1978, § 30-3-12.  The Defendants do not allege that the officers believed Medrano posed a threat to his children.  There is evidence that the police were in the middle of the street and Medrano was in his driveway, as much as twenty feet from the officers, when they shot him.  See Chadwick Aff. ¶¶ 10, 12, at 2 (stating that Medrano was at the "end of the driveway" and the officers were in the "middle of the street"); Second Nevarez Aff. ¶ 8, at 1 ("When Mr. Medrano was about 10 feet from the street, and the police were about another five feet away, I heard gunfire"); Ben. Benavidez Aff. ¶ 5, at 2 ("The officers were in the roadway and the man was in the drive."); Lozano Aff. ¶ 5, at 2 ("The man in the driveway continued to wave his arms around and was moving forward and backward, but was continually getting closer to the officers in the street."); Complaint ¶ 10, at 3 ("Medrano came within 10-20 feet of the officers"); Memorandum ¶ 7, at 4 ("He came within ten to twenty feet of them before they opened fire."); Response ¶ 2, at 2-3 (not controverting this fact).  There is evidence that Medrano moved slowly toward the officers, advancing little by little.  See First Nevarez Aff. ¶¶ 5, 7, at 2 ("[Medrano] was advancing little by little toward the officers.  The officers stayed in the street."); Second Nevarez Aff. ¶ 7, at 1 ("Medrano moved very slowly down his driveway towards the police, taking a step and pausing with his arms at his side.").

-35-

See also Complaint ¶¶ 9, 10, at 2-3 ("Medrano turned towards Frias and Baker and occasionally took a step or two in their direction down his driveway . . . .  he slowly stepped down his driveway. . . .  Medrano came within 10-20 feet of the officers.  He stopped once again, demanding that the officers shoot him.  They then opened fire . . . .").  A reasonable jury could find that lethal force was not an objectively reasonable response to a man who was not armed with projectile weapons, with his arms at his sides, who was twenty feet from the officers, who was in his driveway when the officers were in the street, and who was slowly moving towards the officers.

Moreover, a reasonable jury could infer that, while Medrano had two weapons, neither was a gun or something that he could easily throw or use to hurt the officers at range.  There is evidence that he was not poised to throw his weapons at the officers when they shot him.  See Chadwick Aff. ¶ 11, at 2 ("He had his hands raised at chest height with the weapons pointed up."); Second Nevarez Aff. ¶ 7, at 1 ("Medrano moved very slowly down his driveway towards the police, taking a step and pausing with his arms at his side."); Complaint ¶ 9, at 2 ("He held the kitchen knife in one hand and the baseball bat in the other, with his arms hanging down, extended, by his legs.").  It is not clear that he was capable of causing immediate serious harm to the officers without something else happening.  Thus, there are facts to support the Plaintiffs' constitutional claims of excessive force.  Because there is a genuine of material fact about the alleged violation of the Plaintiffs' constitutional rights, the Defendants are not entitled to qualified immunity as a matter of law.

The Defendants are not protected by qualified immunity against the Plaintiffs' excessive force claim.  The record before the Court provides no basis to distinguish the Court's qualified immunity inquiry from its excessive force inquiry.  It is no longer good law that the Fourth Amendment inquiry is coextensive with the qualified immunity inquiry.  See Stuart v. Jackson, 24

F. App'x 943, 954 n.5 (10th Cir. 2001)("[T]he Court in <u>Saucier</u> rejected this court's precedents which conflated the Fourth Amendment and qualified immunity inquiries.  <u>See, e.g.</u>, <u>Wilson v. Meeks</u>, 52 F.3d 1547, 1552 (10th Cir. 1995); <u>Quezada v. County of Bernalillo</u>, 944 F.2d 710, 718 (10th Cir. 1991).").  Under <u>Saucier v. Katz</u>, "even if the officer unreasonably used force in violation of the Fourth Amendment, qualified immunity should be granted if the officer had a reasonable, albeit mistaken, belief about the legality of the officer's actions."  <u>Stuart v. Jackson</u>, 24 F. App'x at 954.  The parties present no evidence indicating that the officers had "reasonable, albeit mistaken, belief[s]" that are distinct from the evidence which shows that the Plaintiffs excessive force claim does not fail as a matter of law.

To reach this conclusion, it is not necessary to adopt with the Plaintiffs' argument that the officers could have used less force or retreated.  The officers did not have a duty to retreat.  <u>See</u> <u>Roy v. City of Lewiston</u>, 42 F.3d 691, 696 (1st Cir. 1994)(holding that officers were not liable for excessive force despite plaintiffs' expert's testimony that the officers could have retreated); <u>Reed v. Hoy</u>, 909 F.2d 324, 331 (9th Cir. 1989)("Reed has not cited to this court a single case from any jurisdiction suggesting that police officers have the same duty to retreat as ordinary citizens.  In our view, such a duty may be inconsistent with police officers' duty to the public to pursue investigations of criminal activity.").  Nor did Frias and Baker have a duty to endanger themselves by responding with less lethal force.  "[T]he clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative."  <u>Jonas v. Board of Comm'rs of Luna County</u>, 699 F. Supp. 2d at 1296.  The question therefore is not whether less lethal force could have been used against Medrano, but whether the force used by Frias and Baker was reasonable under the circumstances.  While they were not required to use less than lethal force,

there is a question whether lethal force was reasonable.  Under the facts pled and on the record before the Court, the Court cannot say, as a matter of law, that Frias' and Baker's actions were objectively reasonable, and that they are entitled to the protection offered under the doctrine of qualified immunity.

## II.    THE COURT WILL NOT DISMISS VILLA'S PROCEDURAL DUE-PROCESS CLAIM OR HER CHILDREN'S UNCONSTITUTIONAL SEIZURE CLAIMS.

The Defendants contend that taking Medrano's children into custody without Villa's consent was reasonable in light of the circumstances.  The Plaintiffs contend that taking the children was an unconstitutional seizure, and violated Villa's procedural and substantive due-process rights.  The Court denies the Defendants' request that it dismiss or grant them summary judgment on Count III of the Plaintiffs' Complaint for the unreasonable seizure of the children or on Villa's procedural due-process claim.

### A.    THERE IS EVIDENCE THAT THE DEFENDANTS VIOLATED THE CHILDREN'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS.

The Defendants contend that the Court should dismiss the claims by Villa and the children, because the individual Defendants' actions with regards to them were lawful. The Plaintiffs contend that taking Medrano and Villa's children to the police station immediately after they witnessed their father's fatal shooting shocks the conscience is and "unconstitutional per se."  Response at 17.  The undisputed facts are:

> The children had been witnessed [sic] Mr. Medrano assault Ms. Villa.  Mr. Medrano had kidnapped the children and was known to be violent, extremely upset, and suicidal.  The children had witnessed the stand-off between Mr. Medrano and the police, and they had witnessed Mr. Medrano's shooting and death. . . .  The police took the children to the safety of a police cruiser immediately after the shooting.  The police asked Ms. Villa's brother, the children's uncle, to accompany the children to the police station.  An officer interacted with one of the children outside the presence of the uncle regarding the incident.

Reply at 6 (citations to the record omitted).  The Defendants contend that these facts show their actions were reasonable and that they are therefore entitled to summary judgment on the children's Constitutional claims.

Because there is no dispute that one of the children was detained briefly for questioning without Villa's consent, and without her being present at a police station, the question is whether this fact establishes a constitutional violation.  The Defendants contend that the children's detention was an investigative detention.  Investigative detentions are "Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion [that the person stopped is involved in] criminal activity."  United States v. Davis, 94 F.2d at 1468.  The Tenth Circuit, in determining the reasonableness of an investigative detention, applies a two-prong test: (i) "whether the officer's action was justified at its inception"; and (ii) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  United States v. Shareef, 100 F.3d at 1500 (quoting Terry v. Ohio, 392 U.S. at 20).  "The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."  United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993).  The Defendants do not, however contend that they suspected the children of wrongdoing or that they had reasonable suspicion the children had committed a crime.  Consequently, they have no basis to justify the children's investigative detention.  "Defendants clearly seized [the children] within the meaning of the Fourth Amendment, and [D]efendants did so without a warrant and without exigent circumstances.  Plaintiffs have therefore sufficiently alleged a violation of [the children's] Fourth Amendment right to be free from unreasonable seizures."  Roska v. Peterson, 328 F.3d 1230, 1244 (10th Cir. 2003).

Taking the children without reasonable suspicion is an unconstitutional seizure.

The Defendants contend that, given the circumstances, the children's detention was not such that the officers could have known that they were violating any clearly established right. The Defendants' argument is unavailing. "At the time of the incident, it was clearly established that a police officer cannot effect an investigative detention without reasonable suspicion." Lundstrom v. Romero, 616 F.3d 1108 (10th Cir. 2010)(citing Hiibel v. Sixth Judicial Dist. Ct. of Nev., 542 U.S. 177, 185 (2004); Cortez v. McCauley, 478 F.3d at 1108). The Defendants therefore do not enjoy qualified immunity against the Children's Fourth Amendment claims. Accordingly, the Court will not dismiss the Fourth Amendment claims brought on behalf of the children.

### B.   THE COURT WILL NOT GRANT SUMMARY JUDGMENT ON VILLA'S PROCEDURAL DUE-PROCESS CLAIM.

In their Complaint, the Plaintiffs contend:

> The decision of the individual Defendants to prevent Plaintiff Villa from going to and caring for her children after they had just witnessed their father's execution, constituted a violation of her substantive and procedural due process rights to familial association and familial integrity as secured by the Fourth, Fifth and Fourteenth Amendments and by the fact that the individual Defendants' conduct with regard to these young children and her parental rights shocks the conscience.

Complaint ¶ 28, at 6. "Plaintiffs assert, first and foremost, that this seizure and de facto arrest of the infants was a procedural due process violation of their and their mother's Fourth Amendment rights." Response at 20. At the hearing, the Plaintiffs clarified that Villa brings subsantive and procedural due-process claims based on the police not allowing her to pick up her children:

> COURT: Do you think under the federal constitution that she has some claim here of her own?
>
> MR. LYLE: Just the claim for the breach of her rights of familial association and that, yes, as outlined in our brief, that interfering under these circumstances with her constitutional right to go to her children and be with her children immediately after

what has happened, yes, we do assert that that is a constitutional right of Ms. Villa.

THE COURT:  All right.  So it's the -- so her only claim is, then, that the police at her house interfered with her ability to associate with her children.

MR. LYLE:  Yes, Your Honor, to go pick up her children.

Tr. at 34:16-35:6.

"Plaintiffs sufficiently alleged a violation of their clearly established constitutional right to maintain a family relationship."  Roska ex rel. Roska v. Sneddon, 437 F.3d 964, 969 (10th Cir. 2006).  In Roska v. Peterson, the Tenth Circuit addressed whether state employees' removal of a twelve-year-old child from his family on suspicion that he was a victim of Munchausen Syndrome by Proxy without pre-depravation procedure violated the parent's procedural due-process rights. The Tenth Circuit held that no emergency circumstances existed to justify removal without due process, because "[the child's] health and safety were not in immediate danger."  Roska v. Peterson, 328 F.3d at 1250.   The Tenth Circuit stated:

> In Santosky v. Kramer, the Supreme Court made clear that termination of parental rights impinges upon a liberty interest of which a citizen may not be deprived without due process of law.  455 U.S. 745, 753-54 . . . (1982).  Santosky dealt only with the proper standard of review and arose within the context of a permanent termination of parental rights.  This circuit has applied Santosky's holding, however, to the temporary seizures of children and has held that notice and a hearing are required before a child is removed  "'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'"  Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(quoting Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 848 . . . (1977)).  "Valid governmental interests" include "emergency circumstances which pose an immediate threat to the safety of a child."  Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir. 1997).  As the Second Circuit has noted, the "mere possibility" of danger is not enough to justify a removal without appropriate process. Tenenbaum v. Williams, 193 F.3d 581, 594 (2d Cir.1999).

Roska v. Peterson, 328 F.3d at 1246.  The Tenth Circuit held that the "plaintiffs ha[d] pled sufficient facts to demonstrate that emergency circumstances did not exist to justify [the child's]  immediate

removal from the home without notice or a hearing."  328 F.3d at 1246.

Similarly, the children were taken to the police station for temporary detention without affording Villa a pre-deprevation hearing.  The Defendants have not alleged facts establishing an "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'"  Spielman v. Hildebrand, 873 F.2d at 1385.  There is no evidence in the record indicating that the children were taken into custody at the police station for their health or safety.  See Tr. at 27:17-19 ("MR. MARTINEZ: There's nothing in the record that supports that the children were taken from this home to ensure their safety, making an inference."); Tr. at 36:7-11 ("THE COURT: Well, where is the evidence in the record that the officers were concerned about the safety of the children?  MR. MARTINEZ: Your Honor, I would submit that there's nothing in the record that would say that.").  While it was objectively reasonable not to leave the children unattended in the house after Medrano was shot,[6] it was not objectively reasonable to then take the children in custody at the police station.

Moreover, the Tenth Circuit held

[i]n Malik v. Arapahoe County Dep't of Soc. Servs. . . . "that it [is] clearly established law that, except in extraordinary circumstances, a parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures."  191 F.3d 1306, 1315 (10th Cir. 1999) (citations

_____

[6] The Plaintiffs conceded at the hearing that it was not a violation of Villa's constitutional rights to remove the children from the house and place them in the police vehicle under the circumstances:

I take issue with marching these children past their father's body and blood and putting them in the police car, but I don't think that's unconstitutional.  I think that okay let's get them in the police car, make sure nothing else is going on here, you know, they're there, they're in a secure location.  I have some issue with that . . . but fine they put them in the police car.

Tr. at 32:19-33:4 (Lyle).

-42-

> omitted).  In this case, defendants afforded [Villa] no process prior to removing [her
> children].   Defendants did not even attempt to obtain an ex parte order.   Further,
> defendants point to no extraordinary circumstances that would justify the complete
> absence of pre-deprivation procedural safeguards.    Although "emergency
> circumstances which pose an immediate threat to the safety of a child" might justify
> the absence of pre-deprivation procedures, Hollingsworth, 110 F.3d at 739, in this
> case, [the children's] health and safety were not in immediate danger.   Thus,
> regarding [P]laintiffs' claim under the Fourteenth Amendment, clearly established
> law plainly put [D]efendants on notice that their conduct violated the Constitution.

Roska v. Peterson, 328 F.3d at 1250.  Because the Defendants offer no evidence stating or justifying

their reasons for taking the children into custody at the police station for questioning, the Defendants

cannot "prove that her conduct was nonetheless objectively reasonable" in the face of clearly Villa's

clearly established rights.  Cannon v. City & County of Denver, 998 F.2d 867, 874 (10th Cir. 1993).

Because the "Plaintiffs sufficiently alleged a violation of their clearly established constitutional right

to maintain a family relationship," Roska ex rel. Roska v. Sneddon, 437 F.3d at 969, the Court

denies the Defendants' summary judgment on Villa's procedural due-process claim.[7]

---

[7]     The Plaintiffs state:

> A reasonable jury could also find this conduct rises to the level of a substantive due
> process violation.  Plaintiffs assert, first and foremost, that this seizure and de facto
> arrest of the infants was a procedural due process violation of their and their
> mother's Fourth Amendment rights.  Even if it was not, substantive due process
> protects against such conduct which is not covered by a more definite provision of
> the Constitution.  County of Sacramento v. Lewis, 523 U.S. 833 (1998).  It protects
> fundamental rights of familial and personal integrity, including "rights to marry, to
> have children, to direct the education and **upbringing of one's children**, to marital
> privacy, to use contraception, to bodily integrity, and to abortion." Washington v.
> Glucksberg, 521 U.S. 702, 720 (1997)(emphasis added).

Response at 20 (emphasis in original).  Because the Court does not grant summary judgment on the
Plaintiffs' procedural due-process claim, it need not address the viability of the Plaintiffs' alternative
substantive due-process claim.  See County of Sacramento v. Lewis, 523 U.S. at 842 ("[W]e held
in Graham v. Connor, 490 U.S. 386 . . . (1989), that '[w]here a particular Amendment provides an
explicit textual source of constitutional protection against a particular sort of government behavior,
that Amendment, not the more generalized notion of substantive due process, must be the guide for
analyzing these claims.").

III.    **THE COURT WILL NOT DISMISS THE PLAINTIFFS' CLAIMS AGAINST THE CITY OF LAS CRUCES IN ITS SUPERVISORY CAPACITY.**

The Defendants move to dismiss the Plaintiffs supervisory liability claim.  The Plaintiffs have sued the officers in both their individual and their official capacities.  The Plaintiffs contend that the City of Las Cruces is liable for the officers' alleged use of excessive force, because the police department's policies, practices, and procedures led to the officer's actions:

> The constitutional deprivations committed by the individual Defendants were the result of the policies, practices and procedures of the Las Cruces Police Department.  Specifically, for many years the Las Cruces Police Department has known of numerous and often lethal applications of lethal force by its officers.  In each and every instance known, the officers are never disciplined and are never given any additional training to prevent or discourage their conduct.
>
> The City of Las Cruces hired an independent consulting firm which conducted a complete review of its department.  This review, which was completed approximately two (2) yeas ago and presented to the City, found numerous deficiencies in the Las Cruces police department's policies, procedures and training.  On information and belief, none of the suggested changes and improvements contained within this study were ever implemented by the Las Cruces Police Department.

Complaint ¶¶ 31-32, at 6-7.

"[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton v. Harris, 489 U.S. 378, 388  (1989).  To find a municipality liable under 42 U.S.C. § 1983, the Plaintiffs must prove that: (i) the officers exceeded constitutional limitations; (ii) the actions arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (iii) inadequate training or supervision demonstrates a deliberate indifference on the part of the City towards persons with whom the officers come in contact; and (iv) there is a direct causal link between the constitutional deprivation and the

-44-

inadequate training or supervision.  See Allen v. Muskogee, 119 F.3d 837, 841-42 (10th Cir. 1997).

A suit against a government officer in his official capacity is the same as a suit against the entity of which the officer is an agent.  See McMillian v. Monroe County, 520 U.S. 781, 785 n.2 (1997)("We have explained that a suit against a governmental officer 'in his official capacity' is the same as a suit 'against [the] entity of which [the] officer is an agent.'" (citations omitted)).  The Defendants contend that the Plaintiffs cannot show a constitutional violation on the part of the officers, which is dispositive as to the City of Las Cruces' liability.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."  (citations omitted)); Moore v. City of Wynnewood, 57 F. 3d 924, 935 (10th Cir. 1995)("Our conclusion that Moore has not shown a constitutional violation also defeats his wrongful demotion tort claim against the City insofar as it relies on his constitutional claim.").  Because the Court has not found that the Plaintiffs' constitutional claims fail as a matter of law, the Defendants cannot prevail on this basis.

The Defendants further contend that the Plaintiffs have failed to plead inadequate training or supervision and a causal link between those inadequacies and the constitutional deprivation.  The Plaintiffs' allegations are sufficient to overcome a motion to dismiss.  The Plaintiffs allege that, following a number of lethal applications of force by the City of Las Cruces' police officers, the City of Las Cruces hired an independent consulting firm which conducted a complete review of its department.  This review, which was completed approximately two yeas ago and presented to the City, found numerous deficiencies in the Las Cruces police department's policies, procedures and training, but the city implemented none of the recommendations.  The Plaintiffs allegations cross

the line of plausibility that the Defendants' failure to address the deficiencies identified in the study amounts to inadequate training or supervision that is linked to the officers shooting Medrano. Consequently, the Court denies the Defendants' motion to dismiss the Plaintiffs' supervisory liability claims against the City of Las Cruces, Count IV.

## IV. THE PLAINTIFFS HAVE NOT STATED A BYSTANDER LIABILITY CLAIM UNDER THE NMTCA, BUT THEIR NMTCA EXCESSIVE FORCE CLAIM SURVIVES.

The Plaintiffs contend that Frias and Baker's use of deadly force against Medrano was grossly negligent. They also contend that the Individual Defendants are liable to Medrano children under a negligence theory of bystander liability, because the children witnessed his shooting and were then taken to the police station and interviewed without Villa or her consent. The Defendants respond that they are immune from the Plaintiffs' tort claims under the NMTCA. The Court agrees that sovereign immunity is not waived under the NMTCA for the bystander claim, but concludes that immunity is waived for the Plaintiffs' claim against Frias and Baker's grossly negligent use of deadly force against Medrano. The Court therefore dismisses the Plaintiffs' bystander tort claim, but not the Plaintiffs' excessive force tort claim.

### A. THE NMTCA BARS BYSTANDER CLAIMS.

In litigation under the NMTCA against a state government agent, the Plaintiffs must identify a tort for which immunity has been waived, and where the Plaintiff cannot find a waiver, there is no recovery. See Derringer v. State, 133 N.M. at 725, 68 P.3d at 965 (upholding dismissal of prima-facie tort because no waiver for this tort under the NMTCA). The NMTCA does not expressly list intentional infliction of emotional distress or negligent infliction of emotional distress among the enumerated torts for which immunity is waived for law-enforcement officers. Section 41-4-12

states:

> The immunity granted pursuant to Subsection A of § 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12.  The Supreme Court of New Mexico has held that the New Mexico Legislature has not waived immunity for intentional infliction of emotional distress, see Garcia-Montoya v. State Treasurer's Office, 130 N.M. at 43, 16 P.3d at 1102 (affirming that "intentional infliction of emotional distress and defamation . . . were barred by the Tort Claims Act"), or for negligent infliction of emotional distress, see Weinstein v. City of Santa Fe, 121 N.M. at 653, 916 P.2d at 1320 ("Section 41-4-12 does not, however, provide for a separate cause of action for the tort of negligent infliction of emotional distress in the list of enumerated common-law torts for which immunity is waived.  Therefore, a plaintiff may not maintain a separate bystander claim for negligent infliction of emotional distress . . . .").  Moreover, the Court of Appeals for New Mexico has construed the NMTCA as "evincing a legislative intent not to waive immunity for injuries to indirect or incidental victims of tortious acts committed by government employees."  Lucero v. Salazar, 117 N.M. 803, 806, 877 P.2d 1106, 1109 (Ct. App. 1994).  The Court therefore dismisses with prejudice the Plaintiffs' bystander claims for Medrano's children.

### B.   THE NMTCA DOES NOT BAR THE PLAINTIFFS' GROSS NEGLIGENCE DEADLY FORCE CLAIM.

The NMTCA does not bar the Plaintiffs' claim that Frias and Baker were grossly negligent in using deadly force against Medrano.  The Supreme Court of New Mexico has held that "a claim arising out of one of the common-law torts enumerated within the Section 41-4-12 waiver of

immunity is essentially a common-law negligence claim, and the plaintiff need only show a violation

of a common-law duty." Weinstein v. City of Santa Fe, 121 N.M. at 653, 916 P.2d at 1320 (citing

Blea v. City of Espanola, 117 N.M. 217, 220-21, 870 P.2d 755, 758-59 (Ct. App. 1994)(noting

law-enforcement officers may be held liable for negligently inflicting one of the enumerated torts),

cert. denied, 117 N.M. 328, 871 P.2d 984 (1994).  Accordingly, in Quezada v. County of Bernalillo,

the Tenth Circuit stated:

> The fact that Deputy Sauser did not subjectively intend to harm Ms. Griego is immaterial because under New Mexico law if "'the basis of an action is assault and battery, the intention with which the injury was done is immaterial * * * provided the [intentional] act causing the injury was wrongful * * *.'" California First Bank v. New Mexico, 111 N.M. 64, 74 n.6, 801 P.2d 646, 656 n.6 (1990) (quoting Keel v. Hainline, 331 P.2d 397, 399 (Okla. 1958)).  The district court findings indicate Deputy Sauser's actions were negligent, and therefore wrongful.  Thus, Deputy Sauser's actions qualify as a battery for purposes of the Tort Claims Act.  See N.M.Stat.Ann. § 41-4-12.

944 F.2d at 720 n.5.  See NMSA 1978, § 41-4-12 ("The immunity granted pursuant to [NMSA 1978,

41-4-4(A) ] does not apply to liability . . . resulting from . . . deprivation of any rights, privileges or

immunities secured by the constitution and laws of the United States or New Mexico when caused

by law enforcement officers while acting within the scope of their duties.").  The Plaintiffs'

excessive force claim is essentially a battery claim, which the Plaintiffs allege was the result of the

Defendants' gross negligence.  Because the New Mexico courts have held that law-enforcement

officers may be held liable for negligently inflicting one of the enumerated torts, see Weinstein v.

City of Santa Fe, 121 N.M. at 653, 916 P.2d at 1320, the Court will not dismiss or grant summary

judgment on the Plaintiffs' NMTCA claim based on the officers' use of excessive force against

Medrano.

## V.   THE COURT DENIES THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFFS' NMIPRA CLAIM.

The Defendants contend that the Plaintiffs do not have standing to bring a NMIPRA claim, because the Defendants responded to all of the Plaintiffs' requests and produced the requested documents.[8]  The Plaintiffs contend that the City of Las Cruces' response was not permitted under the statute.  Because the record is inadequate for Court to determine whether the documents fall within an exception to the NMIPRA, the Court will not grant summary judgment for the Defendants on the Plaintiffs' NMIPRA claim.

The Plaintiffs contend that the Defendants did not have a valid reason for denying their records request.  NMSA 1978, § 14-2-11B states:

B. If a written request has been denied, the custodian shall provide the requester with a written explanation of the denial.  The written denial shall:

(1) describe the records sought;

(2) set forth the names and titles or positions of each person responsible for the denial; and

(3) be delivered or mailed to the person requesting the records within fifteen days after the request for inspection was received.

NMSA 1978, § 14-2-1A(4) provides:

---

[8] The Defendants also argued that the request was deficient because it did not disclose the principal.  The Supreme Court of New Mexico recently rejected this argument:

We hold that a principal, whether disclosed or not, can delegate the function of requesting public records to an agent, such as the principal's attorney, and that either the agent or the principal, even if previously unknown to the public records custodian, can enforce that request if it is denied.  We therefore reverse the judgment of the district court dismissing the claims of the San Juan Association, affirm the dismissal as to Electors and Cone, and remand to the district court for further proceedings consistent with this opinion.

San Juan Agric. Water Users Ass'n v. KNME-TV, No. 32,139, ¶ 45, at 13 (Mar. 8, 2011).

> Every person has a right to inspect public records of this state except . . . law enforcement records that reveal confidential sources, methods, information or individuals accused but not charged with a crime.  Law enforcement records include evidence in any form received or compiled in connection with a criminal investigation or prosecution by a law enforcement or prosecuting agency, including inactive matters or closed investigations to the extent that they contain the information listed in this paragraph . . . .

On February 4, 2010, the City Clerk's Office denied Mr. Lyle's first formal records request under the Inspection of Public Records Act, stating: "The records requested are confidential law-enforcement records protected under Section 14-2-1(A)(4) of the Inspection of Public Records Act.  Once any criminal investigation or prosecution by any enforcement or prosecuting attorney is concluded all records not exempt from release will be released."  Letter from to James Lyle from Ether Martinez at 1(dated February 4, 2010).  On April 5, 2010, the Clerk for the City of Las Cruces again denied the release of the records, once more stating: "The records requested are confidential law enforcement records protected under Section 14-2-1(A)(4) of the Inspection of Public Records Act.  Once any criminal investigation or prosecution by any enforcement or prosecuting attorney is concluded all records not exempt from release will be released."  Letter from Esther Martinez to James Lyle at 1(dated April 5, 2010)

The Plaintiffs contend that this exception is inapplicable, because "[n]o 'confidential sources, methods, information or individuals accused' but not charged, were ever part of this incident or employed by the Las Cruces police department."  Response at 23.  The record does not reveal if the records included information related to the City of Las Cruces' criminal investigation into Medrano's shooting or whether the requested records involve "evidence . . . in connection with a criminal investigation or prosecution by a law enforcement or prosecuting agency" about "individuals accused but not charged with a crime."  NMSA 1978, § 14-2-1A(4).  The incident was

the "subject to an ongoing Multi-Agency Task Force investigation."  Letter from Harry Connelly to James Lyle at 1 (dated January 22, 2010).  The record does not reveal, however, when the investigation came to a conclusion.  At the hearing, the parties agreed that the record is not adequately developed for the Court to decide whether the documents fit within NMSA 1978, § 14-2-1A(4).[9]  The Court therefore denies the Defendants' motion for summary judgment on the Plaintiffs' NMIPRA claim.

## VI.    THE COURT DISMISSES THE PLAINTIFFS PUNITIVE DAMAGES CLAIM.

Punitive damages may be available for some of the Plaintiffs' claims.  Punitive damages, however, are not a stand-alone claim.  "[R]equesting punitive damages is not a separate cause of action that should be set out separately in the Complaint."  Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d 1209, 1271 (D.N.M. 2010)(Browning, J.).  Consequently, the Court dismisses the Plaintiffs' Count V, but it does not preclude them from seeking punitive damages for claims that survive and for which the law allows punitive damages.

---

[9] At the hearing, that parties agreed that record is not sufficiently developed for the Court to determine whether the documents are covered under the NMIPRA's exception:

> THE COURT:   And the record's just not robust enough for me to make that determination.

> MR. MARTINEZ:  That would be correct, Your Honor.

> THE COURT:  So on this one I probably need to deny this portion of the motion?

> MR. MARTINEZ:  That would probably be for another day, Your Honor.

> THE COURT:  All right do you agree with that Mr. Lyle.

> MR. LYLE:  Yes Your Honor.

Tr. at 57:7-16.

**IT IS ORDERED** that: (i) the Defendants' Motion to Dismiss for Failure to State a Claim and in the Alternative, Motion for Summary Judgment, filed June 21, 2010 (Doc. 5) is granted in part and denied in part; (ii) the Court denies the Defendants motion for summary judgment on the Plaintiffs' constitutional and NMTCA excessive force claims; (iii) the Court denies the Defendants motion for summary judgment on the Plaintiffs' constitutional claims on behalf of Villa and Medrano's children; (iv) the Court denies the Defendants' motion to dismiss the Plaintiffs' supervisor liability claims; (v) the Court denies summary judgment on the Plaintiffs' NMIPRA claim; (vi) the Court grants summary judgment on the Plaintiffs' bystander NMTCA claims; and (vii) the Court dismisses the Plaintiffs' punitive damages Count without prejudice to the Plaintiffs seeking punitive damages under any Count for which the law permits punitive damages.


_____
UNITED STATES DISTRICT JUDGE

Counsel:

James P. Lyle
Law Offices of James P. Lyle, P.C.
Albuquerque, New Mexico

     *Attorney for the Plaintiffs*

Damian L. Martinez
Annie L. Mason
Holt Babington Mynatt Martinez, P.C.
Las Cruces, New Mexico

     *Attorneys for the Defendants*